### E. I. DU PONT DE NEMOURS & CO. v. BRISCO.*

(Circuit Court of Appeals, Fourth Circuit. December 5, 1918.)

No. 1656.

1. MASTER AND SERVANT ⊂⇒121(1)—FACTORY ACT—CONSTRUCTION—GUARDING VATS.

Under section 2 of the Factory Act of Virginia, that "all vats * * * shall be properly guarded," the place and manner of the guarding must be such as will at least reasonably safeguard employés while engaged in their habitual work and in their necessary passing to and from it.

2. MASTER AND SERVANT ⊂⇒289(22)—ACTION FOR INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Evidence *held* to justify submitting to the jury the question of the contributory negligence of an injured employé in failing to remove an obvious danger at his place of work.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied, 248 U. S. ——, 39 Sup. Ct. 257, 63 L. Ed. ——.

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., Judge.

Action at law by George C. Brisco against E. I. Du Pont de Nemours & Co. Judgment for plaintiff, and defendant brings error. Affirmed.

Charles E. Plummer and J. Gordon Bohannan, both of Petersburg, Va., for plaintiff in error.

John B. Minor and David H. Leake, both of Richmond, Va. (Robert E. Scott, of Richmond, Va., on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. This is a personal injury case. The defendant in error was plaintiff below, and plaintiff in error defendant. They will be so styled here. The plaintiff worked for defendant. He was hurt in what is called the "save-all" or "catch-all" compartment of its gun cotton plant. Every 30 minutes, from the adjoining tub room, a quantity of hot water and steam was discharged into the "save-all." Not infrequently, so much steam was so liberated that plaintiff had to get out more or less rapidly. On one of these occasions, while trying to do so, his foot slipped and his leg went down into a vat filled with hot water, somewhat impregnated with acid. He was badly scalded, and his injuries are perhaps permanent.

The plaintiff says he was hurt because defendant did not give him a safe place in which to work. There was evidence from which the jury might have found that in this respect he was right. The defendant sets up assumption of risk and contributory negligence. The learned judge below withdrew the former of these defenses from the consideration of the jury, because he thought that the uncontradicted evidence showed that the plaintiff's hurt was a direct consequence of defendant's failure to guard the vat, as is required by a penal statute of Virginia. If the enactment is applicable, the ruling was right. Pocahontas Consolidated Collieries Co. v. Johnston, 244 Fed. 368, 156 C. C. A. 654.

The "save-all" room was 30 feet by 80. Of this, 22 or 23 feet by 74 was occupied by a vat or tank, which was without any permanent covering, except the roof of the building. Along one long and one short side there were platforms—the shorter some 6 feet wide and the larger, although usually referred to in the testimony as the "8-foot platform," was according to the presumably accurate measurements furnished by the defendant, 7 feet in width. The vat was filled to the depth of 2 or 3 feet with the acid-impregnated water, which at intervals was discharged into it from the tub room, and in which cotton had been boiled. Some of the cotton came over with the water. The plaintiff was employed to fish it out with a long-handled wooden rake, and after the water had partially drained out of it, but before it had become dry, to place it into buckets or pails, carry it to the tub room, and put it back into the tubs for reboiling.

In constructing the room, no arrangement was made for safe-guarding the employés from such accidents as that which caused the

plaintiff's injury. Indeed, it does not appear that any thought was given to that subject. The 6-foot platform along one end of the room slanted up from one corner of the building, where it was 3 feet or more above the surface of the water, to the other corner, in which it was as much as 6 feet from that surface. The other much longer platform was, as already stated, some 7 or 8 feet wide, and sloped slightly downwards towards the vat. It was about 3 feet above the water. The work of fishing out the cotton does not appear ever to have been done from this platform, nor, so far as the record discloses, was it intended to be used for that purpose. It stood perhaps 6 feet above the bottom of tank, to which the cotton tended to settle, so that a man standing on it would have had to use a rake with a handle 10 or 12 feet long.

Neither of these platforms was guarded in any manner. Transversely over the top of the tank, at intervals of a few feet, were laid 4x6 stringers, with the narrower side up. From time to time, the workmen employed in this room laid planks from one of these stringers to another, usually putting two or three planks side by side. As a rule the platform thus made extended across the center of the tank for nearly its entire length; but, as the planks were not fastened to anything, their position was changed from time to time by the plaintiff, who, for some months before the accident, had been the only person employed in this room, and indeed the only person who spent any appreciable time in it. He stood on this temporary platform, called in the record the "drainage platform," or with one foot on it, and the other on one of the stringers, and with his rake pulled up the cotton and deposited it upon the temporary platform, upon which he was standing. According to some of the defendant's witnesses, plaintiff's predecessors, if not the plaintiff, occasionally stood astraddle over the water, with one foot on one stringer and the other on another. No attempt was ever made to think out or provide a safer method of working. When plaintiff was driven out of the room by the occasional inrush of steam, he had at first to run across one of these 4-inch stringers to the sloping platform, climb up three feet to it, run along it to the 6-foot platform, and then to the exit which opened from the latter. He himself put some planks across two stringers, so that on such occasions he could step from one plank to the other and so reach the sloping platform, and he persuaded one of the carpenters to construct for him some steps which enabled him to get upon that platform more easily and quickly.

There is not a hint in the record that the defendant ever gave a moment's thought to diminishing the risks of the persons who, from time to time, were successively employed in this room. The fact is all the more remarkable because, as the defendant's witnesses testify, it had been the habit, before plaintiff was sent to do the work in this place, to have it done by aged persons or cripples. Doubtless the explanation is to be sought in the pressure under which the responsible heads of these great munition factories were then as now working. The plant was in continuous operation, upon the three-shift system of 8 hours each. Plaintiff was on duty from 7 a. m. to 3 p. m. each day,

but as he could readily enough get out in 8 hours all the cotton which came into the vats in 24, the "save-all" was unoccupied from 3 p. m. to 7 a. m. in each 24-hour period.

As 3 o'clock approached on the day preceding the accident, plaintiff, as he testified, found that the tubs in which he regularly should have put the cotton he then had upon the drainage platform were full. It was not safe to allow the cotton to become dry, as in that condition it might cause explosion or fire. He had accordingly been instructed not to leave it on the platform when he quit work. He testified that, having this in mind, he went to the superintendent or foreman and reported the difficulty to him. He says he was then told that such official would see about it. That there was any such conversation is more or less directly denied by the foreman in question, but as the cotton would not, in fact, in 16 hours dry sufficiently to be at all dangerous, nothing happened, and when he came back at 7 on the morning of the accident the cotton was where he had left it the afternoon before. He testified that he then went to another foreman and reported the situation, and that the latter told him that workmen would be sent to get the cotton off the drainage platform, and instructed plaintiff in the meanwhile to take some more planks and construct with them another temporary platform on the side of the room most remote from the sloping platform. This account is also contradicted with greater or less positiveness. At all event, the plaintiff left the cotton piled up on one section of the drainage platform, and constructed, as he says he was told to do, another temporary platform in the location already mentioned, and from it proceeded with his usual task of raking up the cotton from the bottom of the vat.

At 7:30 a. m. there was one of those discharges of hot water and steam which made it necessary for plaintiff to get out of the room as quickly as he could, and by filling the air with mist the getting out was made somewhat more than usually dangerous. He went from his latest platform to the drainage platform by walking or running along one of the 4-inch stringers. When he reached that platform, his direct course was obstructed by the pile of still wet cotton, and as he went around or through it, his foot slipped, his leg plunged down into the water, and the harm was done.

[1] The defendant argues that it would have done no good to guard the vat, because it says the guards would have been around the outside of the tank, and it was not there that the plaintiff fell, and that it was impracticable to guard the drainage platform upon which the plaintiff slipped, or the stringers which he habitually traversed, and upon which he occasionally worked. Such an argument misconceives the whole purpose of the statute. The enactment (section 2 of the Virginia Factory Act [Laws 1914, c. 16]), declared that "all vats * * * shall be properly guarded." That does not mean necessarily that the guards shall be on the outside of the vat. They should be there if guards at that place are needed to attain the purpose of the Legislature, namely, the protection of the workmen; but the place and manner of the guarding must be such as will at least reasonably safeguard em-

ployés while engaged in their habitual work and in their necessary passing to and from it.

Plaintiff claims that, as the statute requires some things to be done "whenever practical," and omits the quoted words when commanding that vats be guarded, the purpose of the lawmakers was to require such guarding, no matter how difficult it might be.

We are not called upon in this case to express any opinion as to the merits of that contention. Whatever be the answer which may ultimately be given to it, we are persuaded that no employer, who requires or knowingly permits employés habitually to work or pass where there is no protection against falling into open vats, can, upon any construction of the statute, escape from liability, unless he shows at least that the vat could not have been so constructed, and the method of work could not have been so arranged, as to permit the furnishing of such safeguards.

The only evidence offered upon the subject by the defendant is that the temporary platform and the stringers actually used in this vat could not have been readily guarded. Employers may not on such easy terms grant themselves indulgence for sinning against a statute intended for the protection of the lives and limbs of those who work for them.

[2] The defense of contributory negligence rests principally on defendant's contention that plaintiff should have forked the wet cotton from the drainage platform over to the sloping platform. Defendant offered evidence that plaintiff had been told that whenever the drainage platform was full, and there was no room in the tubs for the cotton on it, he should put the cotton on the sloping platform. He denies that he ever had such orders. Defendant replies that, whether he had or not, the sloping platform was there in plain view, and he must have seen for himself how easy it would have been to get the dangerous accumulation of wet cotton off the drainage platform, and with that cotton off the latter platform would have been a safer place than it was, and doubtless the cotton could have been so arranged on the sloping platform that it would not have increased greatly any risk the plaintiff might have been compelled to take in escaping over a portion of it, as he necessarily had to do when he had occasion to leave the room in a hurry.

In view of the contradictory testimony as to the instructions he had received, and the statement of the foreman, made, as plaintiff testifies, less than half an hour before the accident, that workmen would be sent to remove the cotton from the drainage platform, the question of contributory negligence was properly left to the jury under instructions which sufficiently stated the applicable law.

The defendant may not complain of the rejection of some of its offered prayers on this subject. They were either covered by what the court did say, or were properly refused because they attempted to segregate and recite some, but not all, the material facts in evidence.

No error appearing, the judgment below is affirmed.